**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| DEAN PUSHARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO._____ |
| | § | |
| GALVESTON COUNTY, TEXAS, | § | |
| ANDREW MEJIA, | § | JURY TRIAL DEMANDED |
| BRET MOREAU, and | § | |
| JEREMY CREECH, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Dean Pushard brings this civil action under 42 U.S.C. § 1983 against Galveston County, Texas, and against Sergeant Andrew Mejia, Deputy Bret Moreau, and Deputy Jeremy Creech of the Galveston County Sheriff's Office, each sued in his individual capacity, for violations of Pushard's rights under the United States Constitution.

**I. INTRODUCTION**

1.      This is a civil rights action under 42 U.S.C. § 1983 to remedy the unconstitutional treatment of Plaintiff Dean Pushard, a United States Army veteran with a permanent disability and documented post-traumatic stress disorder. Responding to a request for a welfare check, Galveston County Sheriff's deputies found Pushard in an apparent medical crisis. By the deputies' own accounts, Pushard appeared confused, "as if he did

1

not understand what was happening" and "could not hold his head up for longer than a few seconds."

2.      Rather than render aid, the deputies immediately resorted to escalating force. They repeatedly tased Pushard, dragged him from his truck, slammed him face-first onto the pavement, pinned him under their body weight, knelt on his lower back, and continued to tase him. They kept him painfully handcuffed behind his back, refusing paramedics' requests to adjust the restraints and thereby obstructing emergency medical care in order to manufacture a false narrative of "resistance." The abuse continued during medical transport, when one deputy threatened to tase Pushard, telling him he would "ride that lightning again," while he was restrained in a stretcher, and later at the hospital, where he terrorized Pushard with a Taser during cardiac evaluation and treatment, then defied a physician's order by transporting Pushard to jail instead of home.

3.      To conceal their misconduct, the deputies submitted official reports fabricating a narrative of resistance, causing Pushard to be prosecuted for a crime he did not commit. After Pushard filed a formal citizen's complaint, the Galveston County Sheriff's Office informed him that the allegations were "EXONERATED." The County then concealed evidence of the assault by releasing incident reports with targeted redactions, redacting nearly the entire document so that the only visible sentences remaining supported the false narrative of resistance. The County then submitted false statements to the Texas Attorney General in a continued effort to withhold evidence of the misconduct from the public.

4.      Accordingly, Pushard brings claims against the individual deputies for excessive force, deliberate indifference to his serious medical needs, failure to intervene, and malicious prosecution. Pushard also brings a claim against Galveston County under *Monell v. Department of Social Services,* holding the County itself liable because its final policymaker's official ratification of the deputies' unconstitutional conduct was the moving force that caused Pushard's injuries.

## II. JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Pushard brings claims under 42 U.S.C. § 1983 for violations of rights secured by the United States Constitution.

6.      Venue is proper in the Galveston Division of the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Galveston County, Texas.

## III. PARTIES

7.      Plaintiff Dean Pushard is a citizen of the United States and a resident of the State of Texas.

8.      Defendant Galveston County, Texas, is a political subdivision of the State of Texas, organized under the Texas Constitution and the laws of the State of Texas. Galveston County is sued under 42 U.S.C. § 1983 for its own policies, customs, and practices, including those attributable to the County through the Galveston County Sheriff's Office. The County is responsible for the operations of the Galveston County Sheriff's Office. For purposes of Pushard's § 1983 municipal-liability claim, the

Galveston County Sheriff is the County's final policymaker in the area of law enforcement. At all relevant times, Galveston County employed the individual Defendants.

9.      At all relevant times, Defendant Andrew Mejia was employed by the Galveston County Sheriff's Office and acted under color of state law. He is sued in his individual capacity for compensatory and punitive damages.

10.      At all relevant times, Defendant Bret Moreau was employed by the Galveston County Sheriff's Office and acted under color of state law. He is sued in his individual capacity for compensatory and punitive damages.

11.      At all relevant times, Defendant Jeremy Creech was employed by the Galveston County Sheriff's Office and acted under color of state law. He is sued in his individual capacity for compensatory and punitive damages.

12.      Collective references to the deputies are used only for joint conduct or to summarize allegations stated in detail elsewhere in this Complaint. The Complaint otherwise identifies the particular actions or omissions of the individual deputies and provides fair notice of the claims asserted.

## IV. FACTUAL ALLEGATIONS

**A. Moreau and Mejia Responded to a Welfare Check, Found Pushard in Medical Distress and Used Excessive Force Instead of Rendering Aid**

13.      On August 8, 2024, in San Leon, Texas, Deputy Bret Moreau and Sergeant Andrew Mejia of the Galveston County Sheriff's Office responded to a request for a welfare check concerning Pushard.

14.     The call reported that Pushard had been in his truck in a parking lot for approximately two hours, appeared to be falling asleep with his head hitting the horn, and requested that deputies come out to check on him.

15.     The call did not report a crime, a weapon, violence, or any threat to public safety.

16.     Moreau and Mejia arrived shortly after noon. The truck's ignition was off, the windows were rolled up, the temperature neared 90 degrees, and Pushard was alone.

17.     Moreau approached the truck and observed that Pushard was "sitting in the driver's seat passed out with his head resting on the steering wheel." Pushard was slumped forward, shirtless, and drenched in sweat.

18.     Moreau opened the passenger-side door and woke Pushard. Pushard slowly sat up, appeared visibly disoriented, made no threatening movements, and had both hands visible.

19.     Moreau reported that Pushard stared at him with a confused look, "as if he did not understand what was happening."

20.     Moreau asked Pushard no questions about his condition or well-being. Instead, he immediately decided to forcibly remove Pushard from the truck.

21.     Within seconds and before issuing Pushard any command, Moreau directed Mejia to forcibly remove him. Mejia reported that "Moreau motioned for [him] to remove [Pushard] from the vehicle."

22.     Mejia opened the driver's door and saw Pushard sitting in the driver's seat, his hands resting on his thighs, and an empty bottle in the cup holder. Mejia reported that Pushard was drenched in sweat, shirtless, incoherent, and looking beyond Mejia's person.

23.    Mejia's report also stated that Pushard "could not hold his head up for longer than a few seconds."

24.    Mejia offered no aid and asked no questions about Pushard's condition.

25.    As Moreau approached the driver's side, Mejia asked, "Do you want him or do you want me to get him?" Moreau responded, "No, I got him. I'm gonna pull him out."

26.    Before seizing Pushard, Moreau and Mejia did not identify themselves as law enforcement officers and gave no clear instructions for him to exit the truck.

27.    During the initial contact, Pushard made no threatening movement, did not attempt to flee or actively resist, and posed no immediate threat to the deputies or anyone else.

**B. Moreau and Mejia Seized Pushard and Moreau Tased Him Repeatedly While He Was Restrained and Complying**

28.    Mejia and Moreau issued their first commands only as they reached into the truck and physically seized Pushard, grabbing him by his arms and legs. The simultaneous command and seizure gave Pushard no meaningful opportunity to respond or comply.

29.    Within six seconds of the seizure, Mejia threatened Pushard, saying, "Get out. I'm gonna tase you."

30.    Two seconds after that threat, Mejia instructed Moreau, "Tase him."

31.    Moreau, who already had his Taser in hand, immediately tased Pushard.

32.    Despite the pain of the electrical shock, Pushard managed to say, "Okay," in compliance.

33.    Two seconds later, Moreau tased Pushard a second time without warning.

34.    Despite the second shock, Pushard again managed to say, "Okay" in compliance.

35.     In response to his compliance, Moreau then tased him a third time without warning.

36.     Pushard made no threatening movement, did not attempt to flee or actively resist, and posed no immediate threat to the deputies or anyone else.

37.     His only words were repeated statements of compliance.

**C. Moreau and Mejia Slammed Pushard Face-First onto the Pavement, Pinned Him to the Ground, and Moreau Continued Tasing Him**

38.     Moreau and Mejia dragged Pushard from the driver's seat and slammed him face-first onto the pavement. The impact left bleeding wounds on Pushard's face and ear that resulted in permanent scarring.

39.     They pinned Pushard's shirtless body against the burning pavement, kneeled on his lower back and pinned him under their combined body weight. Mejia pressed Pushard's bleeding face against the pavement while Moreau tased Pushard a fourth time, and a fifth time.

40.     In his report, Mejia wrote that Pushard "would not put his hands behind his back and was taken to the ground to be secured in cuffs." Moreau and Mejia did not command Pushard to put his hands behind his back until after they had slammed him face-first onto the pavement.

41.     Moreau reported that after removing Pushard from his truck, they were able to "place" him on the ground. The impact from the takedown caused permanent scarring to Pushard's face.

42.    During this sequence, Pushard made no threatening movement, did not attempt to flee or actively resist, and posed no immediate threat to the deputies or anyone else. He was experiencing a medical crisis and showed no capacity to resist.

43.    Moreau and Mejia inflicted this force on a man who, by their own accounts, "did not understand what was happening" and "could not hold his head up for longer than a few seconds."

**D. Moreau, Mejia, and Creech Obstructed Medical Care and Created a False Narrative of Resistance**

44.    In his call for EMS, Mejia reported Pushard's facial injuries, but omitted that Pushard was in obvious medical distress after two hours in a hot, turned-off truck, that he was unable to support himself, and that Moreau had just tased him five times.

45.    Pushard's face was covered in blood. He could not sit upright on his own. Mejia positioned Pushard against his legs and held him by the shoulder to keep him from falling onto the pavement.

46.    Seeing Pushard in this condition, Moreau asked Mejia if he thought the jail would "take him like that," suggesting they could bypass medical care and take Pushard directly to jail. Moreau called Pushard a "piece of shit" and a "motherfucker," and touched his bleeding wounds with his bare hands while he took photos of his injuries.

47.    Before EMS arrived, Mejia radioed for Deputy Creech to come to the scene, saying, "Hey, Creech, slide over here for us." Later, while speaking to Creech, Mejia deactivated his body-worn camera.

8

48.     When paramedics arrived and asked what happened, Mejia immediately characterized Pushard as combative, saying, "He fought us." Moreau added that they had to take him to the ground.

49.     As EMS treated Pushard and struggled to stop his facial bleeding, Deputy Creech arrived on the scene. Creech saw the paramedics, Moreau, and Mejia crowded around Pushard, who remained handcuffed behind his back on the pavement.

50.     When storeowners offered Creech surveillance video showing Pushard appearing fine two hours earlier, Creech declined, saying, "nah." Moreau mentioned to Creech that Pushard must have been in his truck a while because he was drenched in sweat and "soaked head to toe." Creech searched Pushard's truck and found another bottle. Creech stayed on scene until after paramedics left but did not inquire meaningfully about what had happened or Pushard's condition, asking only, "What are y'all gonna do with him?"

51.     Moreau, Mejia, and Creech speculated that Pushard "must have taken something else" and insisted on this explanation while speaking to paramedics.

52.     While the deputies quietly discussed how to proceed, Moreau stated twice that they could either let Pushard go and seek a warrant or take him to the hospital, remarking to Creech that it was "a shitty situation either way." Moreau recounted to Mejia and Creech that the last time he tried to take someone to jail for Public Intoxication, the jail would not take her because she was too intoxicated to stand up. Creech responded, referring to Pushard, "he ain't a PI."

53.     Paramedics repeatedly asked Moreau and Mejia to move the handcuffs to the front to allow for treatment. Moreau and Mejia refused. When paramedics asked again just

before transport, Mejia replied, "I'd rather not," and justified the refusal by stating they "had to tase him." Moreau added, "Yeah, we had to fight him."

54.    During EMS treatment, Moreau and Mejia repeatedly described Pushard as resisting and combative. These statements are inconsistent with their own body-worn camera recordings, which show that Pushard was incoherent and incapacitated, repeatedly said "okay" in compliance, did not fight or physically resist, and was tased five times while neither aggressive nor posing any threat.

55.    Pushard remained restrained during a medical crisis, showing no capacity to resist.

**E. Moreau Obstructed Medical Care and Threatened to Tase Pushard During Ambulance Transport**

56.    As paramedics prepared for transport, they continued to express concern about Pushard's blood pressure and heart rate. Moreau rode with Pushard in the ambulance to the hospital. Pushard lay strapped to a stretcher, handcuffed behind his back.

57.    When the paramedic attempted to adjust him, the cuffs interfered and caused Pushard to cry out in pain. The paramedic asked what was wrong. Moreau stated that Pushard's hands were "probably hurting from the cuffs."

58.    During transport, paramedics repeatedly asked Moreau to move the handcuffs to the front to allow for treatment. Moreau refused each time, claiming he was following his sergeant's orders.

59.    Moreau finally agreed to move the handcuffs only when Pushard began having obvious difficulty breathing. Before moving them, Moreau first threatened Pushard, stating that if he did anything, he would "ride that lightning again" and "get tased again."

60.    Shortly after Moreau's threat, the paramedic called out Pushard's heart rate at 156.

**F. Moreau Threatened to Tase Pushard While He Was Under Cardiac Evaluation and Active Medical Treatment at the Hospital**

61.    At the hospital, medical staff evaluated and treated Pushard for his injuries and cardiac condition. Moreau remained in the room.

62.    When no medical staff was present, Moreau drew his Taser and threatened to tase Pushard unless he urinated into a bedside urinal in front of Moreau.

63.    Moreau aimed the Taser's laser sight at an EKG electrode on Pushard's chest.

64.    Pushard raised his hands in submission and pleaded with Moreau not to tase him, repeatedly saying, "Okay, I'll do it," "Yes, sir," and "I promise I'll do it."

65.    Moreau pressed the Taser against Pushard's shoulder near the EKG electrodes and the same location of Pushard's body where he had repeatedly tased him in his truck.

66.    Moreau's body-worn camera recorded him threatening Pushard, asking, "Are you gonna do it?" and demanding, "You're gonna do it in here, and you're gonna do it with handcuffs on."

67.    While handcuffed, Pushard struggled to manage his zipper. Moreau stood directly behind him and ordered him to pull his zipper down. Moreau stated, "Don't worry, I'm not looking," and Pushard responded, "Please don't tase me."

68.    When medical staff returned to perform a chest X-ray, Pushard was in a hospital bed in handcuffs, visibly crying.

69.    Moreau then deactivated his body-worn camera.

**G. Hospital Records Confirmed Pushard's Medical Crisis, Physician Discharged Him Home, and Moreau Transported Him to the Galveston County Jail**

70.    Hospital records from Mainland Medical Center document Pushard's severe medical crisis, including a "Critical High" blood alcohol level and abnormal vital signs, and that medical staff could not perform a standard Review of Systems (ROS). The testing revealed no other drugs in Pushard's system.

71.    A physical examination of Pushard documented "multiple scattered abrasions to face, scalp, torso, shoulder, and extremities." Hospital staff actively treated Pushard for his injuries and acute intoxication.

72.    Medical records document that after evaluation and treatment, Dr. Ophelia Sanders ordered Pushard discharged to his home, expressly writing "Yes" next to "Discharged to Home."

73.    The medical records contain no notation that Pushard was cleared for incarceration, no "fit for confinement" determination, and no language indicating a release into law enforcement custody.

74.    Moreau transported Pushard from the hospital directly to the Galveston County Jail.

**H. Moreau Ignored Pushard's Expressed Suicidal Ideation During Custodial Transport**

75.    During the transport from the hospital to the Galveston County Jail, Pushard expressly told Moreau that he was having suicidal thoughts.

76.    Moreau took no action in response to Pushard's statement of self-harm.

**I. Moreau and Mejia Filed False Reports to Conceal Their Misconduct and Initiate Malicious Prosecution; the State Dismissed the Charge**

77.     Mejia and Moreau each submitted official reports containing material misstatements and omissions. These reports are directly contradicted by objective evidence, including their own body-worn camera footage and medical records.

***Mejia's False Report***

78.     Mejia reported that he assisted with a "suspicious person" call. The call was a request for a welfare check.

79.     Mejia reported that he arrived on scene and observed Moreau making contact with Pushard. Mejia arrived before Moreau, and they approached the truck together.

80.     Mejia reported that Pushard was being taken into custody for Public Intoxication. Mejia never told Pushard he was under arrest, and Pushard was not charged with Public Intoxication.

81.     Mejia reported that he gave Pushard "commands to step out of the vehicle" upon opening the door. Mejia gave no such command; he asked only, "What are you doing?" before deciding with Moreau to forcibly remove Pushard.

82.     Mejia reported that he began to "assist" Pushard from the vehicle. Mejia reached into the truck and grabbed Pushard without giving a clear command or an opportunity to comply.

83.     Mejia reported that Pushard "would not place his hands behind his back" after being removed from the truck. Neither Mejia nor Moreau commanded Pushard to put his hands behind his back until after they slammed him onto the pavement.

84.    Mejia reported that Pushard was seated in an "upward position" after the takedown. Pushard could not sit up on his own; Mejia had to prop Pushard up against Mejia's legs to keep him from collapsing.

85.    Mejia reported Pushard's injuries as "superficial cuts and scrapes." Pushard suffered bleeding injuries to his face, ear, scalp, and shoulder that required medical treatment and caused permanent scarring.

86.    Mejia reported that he made the decision to have EMS transport Pushard. EMS made the decision to transport Pushard because of his severe medical crisis, which Mejia had ignored.

87.    Mejia's report, containing these falsehoods, was reviewed by his supervisor, J. Rowlands, on August 18, 2024.

***Moreau's False Report***

88.    Moreau reported that he asked Pushard for his name "several times." Moreau asked only twice, without giving Pushard time to respond, before deciding to forcibly remove him from the truck.

89.    Moreau reported that Pushard "refused to exit the truck." Pushard's only words were "okay," while Moreau repeatedly tased him.

90.    Moreau reported he tased Pushard for "pain compliance" because Pushard "continued to resist." Moreau tased Pushard three times within seven seconds, including immediately after Pushard said "okay."

91.    Moreau reported that Pushard was "placed" on the ground. Pushard was dragged from the truck and slammed face-first onto the pavement.

92.    Moreau reported that EMS decided to transport Pushard to be "cleared for incarceration." EMS transported Pushard for treatment of a medical crisis, and the hospital records state he was "Discharged to Home," with no mention of a clearance for jail.

93.    Moreau reported that he transported Pushard to the jail "without incident." During the transport, Moreau heard Pushard's express suicidal statements and ignored him.

94.    Moreau's report listed A. Espinosa as his supervisor, but it does not indicate that it was reviewed.

95.    Both Mejia's and Moreau's reports undercounted and minimized the number of times Moreau tased Pushard.

96.    Neither Mejia nor Moreau submitted separate use-of-force reports. No written report by Creech has been produced.

97.    Based on the false statements contained in Moreau and Mejia's official reports, on August 9, 2024, the State of Texas formally charged Pushard with Resisting Arrest, Search, or Transport.

98.    The baseless criminal prosecution initiated by the deputies remained pending against Pushard for approximately nine months. As a direct result of the charge, Pushard was forced to post bond, retain a criminal-defense attorney at significant personal expense, and appear for multiple court settings before the State of Texas ultimately dismissed the charge on May 2, 2025.

99.    No other charges were filed in connection with the incident.

**J. Pushard Filed a Formal Complaint and the Galveston County Sheriff's Office Classified the Allegations as "EXONERATED."**

100.    On July 30, 2025, Pushard submitted a formal citizen complaint to the Office of Professional Standards of the Galveston County Sheriff's Office, addressed to the attention of OPS Division Commander Lieutenant Joe Peña.

101.    In his complaint, Pushard described the events of August 8, 2024, including the seizure from his truck, the five Taser deployments, the takedown onto the pavement, his resulting injuries, and Moreau's misconduct in the ambulance and at the hospital.

102.    The evidence available to the Sheriff's Office for its review included body-worn camera recordings of the conduct Pushard described; photographs of his injuries, including images showing his face covered in blood and his body being propped up against Mejia on the pavement; and incident reports containing Moreau and Mejia's own statements about Pushard's apparent medical distress, the repeated use of a Taser against him, and the face-first takedown to the pavement.

103.    The Galveston County Sheriff's Office's own official policies and procedures confirm that the Sheriff is vested with final authority over the disposition of citizen complaints and all disciplinary matters arising from internal investigations.

104.    Pushard later received a written response from the Galveston County Sheriff's Office on official letterhead, dated October 8, 2025, signed by Chief Deputy Melencio Villarreal, stating, "The Office of Professional Standards reviewed your complaint and has reached a conclusion. After a thorough review of your Citizen Complaint Packet, along with the available evidence, the findings of the allegation were EXONERATED."

**K. Galveston County Concealed the Deputies' Misconduct Through Redactions and False Statements to the Attorney General**

105.    In response to a Texas Public Information Act request for records of the incident, Galveston County, through its outside counsel, produced a version of Moreau's report that was redacted to conceal nearly the entire narrative of the encounter.

106.    The County left visible only two substantive sentences from Moreau's narrative: the false claims that Pushard "refused to step out of the vehicle" and was transported to jail "without incident."

107.    Mejia's supplemental report was redacted in its entirety.

108.    To justify withholding the reports, the County's counsel asserted in a letter to the Texas Attorney General that "this case was concluded without charges being filed."

109.    That statement was false. A resisting-arrest charge had been filed against Pushard and was prosecuted by the Galveston County District Attorney's Office for nearly nine months before its dismissal.

110.    In a subsequent letter to the Texas Attorney General related to a separate request for records concerning the OPS investigation of the incident, County's counsel submitted a falsified timeline to the Attorney General to conceal the County's failure to comply with deadlines mandated by the Public Information Act.

**L. As a Result of the Defendants' Unlawful Conduct, Pushard Suffered and Continues to Suffer Severe and Lasting Harm**

111.    As a direct and proximate result of the Defendants' actions, Pushard suffered severe and lasting physical, psychological, and financial harm. His physical injuries

include, but are not limited to: permanent scarring to his face and ear from being slammed onto the pavement; multiple Taser injuries; contact burns from being pinned to the hot asphalt; and wrist and back abrasions and contusions from being painfully handcuffed behind his back for an extended period. He has also endured severe psychological trauma and significant emotional distress and humiliation, including a severe exacerbation of his pre-existing Post-Traumatic Stress Disorder (PTSD). The baseless criminal prosecution resulted in a loss of his liberty, caused substantial reputational harm, and forced him to incur significant financial expense, including the cost of retaining a criminal-defense attorney. The trauma from the incident and fear of future encounters with the deputies ultimately compelled Pushard to relocate to a different city.

## V. CAUSES OF ACTION

**COUNT I**

**42 U.S.C. § 1983 – FOURTH AMENDMENT – EXCESSIVE FORCE**

***Against Defendants Moreau and Mejia, in their Individual Capacities***

112.    Pushard incorporates by reference all preceding paragraphs as if fully set forh herein.

113.    The Fourth Amendment to the United States Constitution protects individuals from unreasonable seizures, including the use of excessive force during a seizure. To state a claim, a plaintiff must allege facts showing (1) an injury, (2) which resulted directly from the use of force, and (3) that the force used was clearly excessive to the need and objectively unreasonable. The objective reasonableness of the force is judged

from the perspective of a reasonable officer on the scene by the totality of the circumstances, including the severity of the offense, whether the person posed an immediate threat, and whether he was actively resisting. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).

114.    Defendants Moreau and Mejia seized Pushard when, without identifying themselves as law enforcement or giving him a meaningful opportunity to wake or comply, they simultaneously reached into his truck and took physical control of his body.

115.    Defendant Moreau used force against Pushard by: reaching into Pushard's truck and seizing his arms; deploying his Taser three times in rapid succession—within approximately seven seconds—while Pushard was seated and restrained inside the truck; dragging Pushard from the truck and slamming him face-first onto the pavement; pinning him face-down on the hot asphalt by applying his body weight and kneeling on Pushard's back; delivering two additional Taser shocks while Pushard was pinned and not resisting; keeping Pushard painfully handcuffed behind his back during EMS care despite repeated medical requests to move the cuffs; and in the hospital, brandishing his Taser and pressing it against Pushard to terrorize him and force him to urinate in front of him while Pushard was a patient undergoing a cardiac evaluation in a hospital room.

116.    Defendant Mejia used excessive force against Pushard by: initiating the seizure by grabbing Pushard's arms and legs inside the truck; dragging Pushard from the truck and slamming him face-first onto the pavement; pinning Pushard's shirtless body to the hot asphalt and holding his lacerated face against the pavement as Moreau continued to tase

him; and refusing paramedics' repeated requests to move the handcuffs to the front, stating he would "rather not" despite Pushard's obvious pain and medical distress.

117.    At the time this force was used, Moreau and Mejia were responding to a request for a welfare check, not a reported offense. The call reported that a man was falling asleep in a truck, had been there for two hours, and stated that he needed to be checked out; it was not a crime in progress.

118.    Pushard posed no immediate threat. His hands were visible, he was unarmed, and he was in a state of medical crisis, as confirmed by the deputies' own reports stating he was "passed out," "confused," and "could not hold his head up."

119.    Pushard was not actively resisting or attempting to flee. His only verbal responses to being tased were repeatedly saying "okay" in compliance.

120.    Moreau and Mejia knew Pushard was medically vulnerable. They knew he had been in a hot truck with no ventilation for approximately two hours and was profusely sweating. They personally observed his confusion and profound physical weakness. This was later confirmed by paramedics' findings on scene and in transport of dangerously elevated vitals and hospital records documenting a "Critical High" 0.4 gm/dl BAC, which is associated with a substantial risk of death.

121.    Under the totality of these circumstances, the escalating sequence of force used by Moreau and Mejia was objectively unreasonable and clearly excessive to any law-enforcement need.

122.    Each of the following applications of force was independently unconstitutional:

a. Initial physical seizure: Seizing Pushard by reaching into the truck and taking physical control of his body before giving any meaningful, intelligible command or allowing time to regain awareness—during a nonviolent welfare check and while he was visibly incapacitated—was objectively unreasonable and clearly excessive to any law-enforcement need.

b. Initial Taser Shocks: Deploying a Taser three times in seven seconds against a man who was seated, restrained, incoherent, and verbally complying inside his vehicle during a welfare check was objectively unreasonable and grossly disproportionate.

c. Violent Takedown: Dragging Pushard from the truck and slamming him face-first onto the pavement, causing bleeding lacerations, was objectively unreasonable given that he was medically incapacitated and not resisting.

d. Continued Tasing While Pinned: Delivering two additional Taser shocks while Pushard was pinned face-down on the ground by both deputies was objectively unreasonable and created a substantial and foreseeable risk of serious bodily injury or death.

e. Painful Handcuffing and Refusal to Adjust: Keeping Pushard painfully handcuffed behind his back during EMS care and transport and repeatedly refusing paramedics' direct requests to move the cuffs served no legitimate law-enforcement purpose and was an unreasonable use of force intended to cause pain, obstruct medical care, and perpetuate a false narrative of resisting arrest.

f. Hospital Taser Threat: Brandishing a Taser and pressing it against a restrained patient undergoing a cardiac evaluation in a hospital room was not a good-faith effort to maintain

control; it was an objectively unreasonable use of force designed to punish, terrorize, and humiliate.

123.    Pushard suffered significant injuries, including bleeding facial injuries and permanent scarring from the takedown; contact burns consistent with prolonged exposure to hot pavement while pinned; wrist and back abrasions and contusions from prolonged handcuffing behind his back and being forced to lie on the cuffs; multiple scattered abrasions to the face, scalp, torso, shoulder, and extremities; Taser injuries; and severe psychological trauma, including an exacerbation of his PTSD. These injuries resulted directly from the multiple, distinct applications of excessive force used by Moreau and Mejia as described above.

124.    Defendants Moreau and Mejia are not entitled to qualified immunity. At the time of this incident, it was clearly established that the Fourth Amendment is violated when an officer uses significant force—including repeated Taser deployments, violent takedowns, and painful and dangerous restraints—against a person who is not actively resisting, poses no immediate threat, and is known to be in a serious medical crisis. *See, e.g.*, *Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020) (holding force is not justified when a suspect is 'pinned to the ground by multiple police officers'); *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) (holding a violation occurs when an officer 'tases, strikes, or violently slams an arrestee who is not actively resisting arrest'); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding excessive force where an officer tased someone who did no more than pull his arm away).

125.    No reasonable officer could have believed it was lawful to tase a compliant, incapacitated man five times during a welfare check, slam him face-first onto pavement, or press a Taser against him near EKG electrodes while he was a patient in a hospital under cardiac evaluation.

126.    As a direct and proximate result of Moreau's and Mejia's unconstitutional acts, Pushard suffered the physical, emotional, and economic damages described in this Complaint.

**COUNT II**

**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

***Against Defendants Moreau, Mejia, and Creech, in their Individual Capacities***

127.    Pushard incorporates by reference all preceding paragraphs as if fully set forth herein.

128.    The Fourteenth Amendment's Due Process Clause guarantees a pretrial detainee the right to be free from an official's deliberate indifference to his serious medical needs, a protection analogous to that afforded an arrestee under the Fourth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 649-50 (5th Cir. 1996) (en banc) (for pretrial detainees); *Nerren v. Livingston Police Dep't,* 86 F.3d 469, 473 (5th Cir. 1996) (applying the same standard to arrestees). To state such a claim, a plaintiff must allege facts showing that: (1) he had an objectively serious medical need; (2) the defendant official had subjective knowledge of facts from which an inference of a substantial risk of serious harm could be drawn, and the official actually drew that inference; and (3) the official's

conscious disregard of that risk caused the plaintiff's injury. *See Gobert v. Caldwell,* 463 F.3d 339, 345-46 (5th Cir. 2006) (adopting the standard from *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A serious medical need is one that is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gobert*, 463 F.3d at 345 n.12.

129.    At all relevant times while in the custody of Moreau, Mejia, and Creech, Pushard suffered from multiple, simultaneous, and objectively serious medical needs that, individually and in combination, posed a substantial risk of serious harm, including death.

130.    These needs were obvious and documented, and included:

 a. A Life-Threatening Medical Crisis: As confirmed by hospital records, Pushard was experiencing a multifaceted medical emergency, including a blood-alcohol concentration of 0.4 gm/dl—flagged as "HH" and "Critical High" and associated with a substantial risk of coma and death, with toxicology results later confirming the absence of any other drugs in his system—compounded by prolonged heat exposure and dehydration;

b. Acute Physiological Distress: As documented by paramedics on scene and during transport, Pushard exhibited dangerously abnormal vital signs, including a heart rate of 156 beats per minute and a blood pressure of 164/71, prompting a cardiac evaluation at the hospital;

c. Traumatic Physical Injuries: As a direct result of Moreau and Mejia's force, Pushard had actively bleeding lacerations on his face and ear, multiple scattered abrasions to the

face, scalp, torso, shoulder, and extremities; Taser injuries, and burn injuries consistent with being pinned to the hot pavement; and

d. An Acute Psychiatric Crisis: During transport from the hospital to the Galveston County Jail, Pushard explicitly stated he was having suicidal thoughts, which constitutes a serious psychiatric need.

131.    Defendant Moreau was subjectively aware of and consciously disregarded the substantial risk of death and serious harm posed by Pushard's medical crisis.

132.    Moreau knew Pushard was in a severe medical crisis. He knew Pushard had been in a hot, turned off truck with no ventilation for approximately two hours; he personally observed Pushard was "passed out," so "drenched in sweat" that he remarked to Defendant Creech that Pushard must have been in the truck for a while, and was so physically incapacitated that he was unable to stand or sit upright on his own; he heard paramedics announce the dangerously elevated vital signs and express concerns about his heart rate and blood pressure; he knew Pushard was undergoing cardiac evaluation at the hospital; he acknowledged on camera that the handcuffs were causing Pushard's pain; and he personally heard Pushard's expression of suicidal ideation.

133.    Moreau's disregard went beyond mere indifference and constituted active interference and malicious escalation of risk. He consciously disregarded the risk by: (1) repeatedly refusing paramedics' requests to move the handcuffs to the front, instead adopting and reinforcing a false narrative that "we had to fight him" as a pretext to obstruct necessary medical care; (2) threatening to make a known cardiac patient "ride that lightning" again; (3) pressing his Taser against Pushard near EKG electrodes, an act

25

of torment that created a new and substantial risk of precipitating a cardiac event; and (4) completely ignoring Pushard's explicit statement of suicidal thoughts, taking no steps to ensure his safety.

134.    Defendant Mejia was subjectively aware of and consciously disregarded the substantial risk of serious harm posed by Pushard's medical needs.

135.    Mejia knew Pushard was in a severe medical crisis. His own report admits Pushard was so incapacitated he "could not hold his head up." He knew Pushard had been in a hot, turned off truck for two hours; observed he was "drenched in sweat"; heard the paramedics announce the abnormal vital signs; and personally witnessed that Pushard was so physically incapacitated he was unable to stand on his own or sit upright.

136.    Mejia consciously disregarded this known risk by actively obstructing medical care. When paramedics repeatedly asked for the handcuffs to be moved, Mejia refused, stating he would "rather not" because, as he claimed, "we had to tase him"—a pretextual justification that prioritized maintaining a false narrative of resistance over providing necessary medical care. His decision to keep Pushard painfully and dangerously restrained in the face of a known medical emergency was a conscious disregard of the substantial risk of harm.

137.    Defendant Creech was subjectively aware of and consciously disregarded the substantial risk of serious harm posed by Pushard's medical needs.

138.    Creech knew Pushard was in a severe medical crisis. He arrived on scene and stood directly in front of Pushard, observing his obvious incapacity and altered mental status. He witnessed that Pushard was so physically incapacitated that he could not stand

or sit upright and was forced to lean back on his own painfully applied handcuffs, hearing Pushard cry out in pain. Creech heard the paramedics' repeated concerns regarding Pushard's abnormal vital signs and heard Defendant Moreau remark that Pushard was "drenched in sweat." During his own search of Pushard's truck, Creech discovered a bottle of alcohol, providing him with independent, firsthand knowledge of the severity of Pushard's intoxication and the gravity of the medical emergency.

139.    When a storeowner offered to show him video evidence of Pushard from two hours prior, Creech refused, stating, "nah," and instead engaged in baseless speculation that Pushard "must have taken something else," demonstrating his willful blindness to the true nature of the obvious medical emergency.

140.    Creech consciously disregarded this known risk by making the deliberate choice not to intervene. He was present during the repeated EMS requests to adjust the handcuffs and Mejia's and Moreau's refusals.

141.    Despite having the ability and opportunity to act, Creech's choice not to intervene served to endorse and facilitate the unconstitutional obstruction of medical care. His on-scene refusal to review evidence while speculating about non-existent drugs was an act of conscious disregard for the obvious and substantial risk of serious harm presented by the combination of symptoms he personally observed.

142.    As a direct and proximate result of the deputies' deliberate indifference, Pushard suffered additional and prolonged physical pain, increased psychological trauma from being tormented during a medical crisis, and was subjected to a continued and substantial risk of catastrophic medical harm, including cardiac arrest and death.

143.    Defendants Moreau, Mejia, and Creech are not entitled to qualified immunity. At the time of this incident, it was clearly established that an officer violates the Fourteenth Amendment when, with knowledge of a substantial risk of serious harm, he consciously disregards that risk. This includes actively interfering with or obstructing necessary medical care requested by paramedics; threatening a known cardiac patient with a Taser; or consciously ignoring an explicit expression of suicidal ideation. *See Edmiston v. Borrego*, 75 F.4th 551, 557 (5th Cir. 2023) (holding that "the Fourteenth Amendment protects pretrial detainees' right to... 'protection from known suicidal tendencies'" and a violation occurs when officials with "actual knowledge of the substantial risk of suicide... respond[] with deliberate indifference"). This clearly established rule also applies to an officer who is present, aware of the substantial risk and the obstruction of necessary medical care, and who consciously chooses to take no action to stop it.

144.    No reasonable officer could believe it was lawful to refuse paramedics' requests to adjust restraints on a person in a life-threatening crisis, to torment that person with a Taser during a cardiac evaluation, or to ignore his statement of suicidal intent.

**COUNT III**

**42 U.S.C. § 1983 – FAILURE TO INTERVENE (BYSTANDER LIABILITY)**

***Against Defendant Creech, in his Individual Capacity***

145.    Pushard incorporates by reference all preceding paragraphs as if fully set forh herein.

146.    An officer has a legal duty to intervene to prevent a fellow officer from violating an individual's constitutional rights. An officer who is present at the scene, observes the

violation, and has a reasonable opportunity to prevent the harm but chooses not to act can be held liable under 42 U.S.C. § 1983. *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). To state a claim for bystander liability, a plaintiff must allege facts showing that the defendant officer (1) knew a fellow officer was violating an individual's constitutional rights, (2) had a reasonable opportunity to prevent the harm, and (3) chose not to do so. *See Cantu v. City of San Antonio*, 69 F.4th 270, 281 (5th Cir. 2023).

147.    As alleged above, Moreau and Mejia were committing ongoing constitutional violations against Pushard in Creech's presence, including: (a) objectively unreasonable force in violation of the Fourth Amendment; and (b) deliberate indifference to serious medical needs and interference with necessary medical care in violation of the Fourteenth Amendment.

148.    Mejia summoned Creech to the scene by radio. Creech arrived as EMS began evaluating and treating Pushard, while Pushard was on the ground, handcuffed, injured, and surrounded by both paramedics and Moreau and Mejia. At the time of Creech's arrival, Moreau and Mejia were continuing to maintain painful custody restraints and refusing repeated EMS requests necessary to facilitate treatment.

149.    Creech knew the constitutional violations were occurring. He stood directly in front of Pushard and personally observed his obvious incapacity and altered mental status, including watching as Pushard was forced to lean back on his painfully applied handcuffs and hearing Pushard cry out in pain. Creech heard paramedics express concern regarding Pushard's medical condition and heard their repeated requests to move or adjust the handcuffs, along with Moreau and Mejia's refusals.

150.    While EMS was on scene, Creech searched Pushard's truck and found another bottle in the backseat, confirming for Creech the severity of Pushard's intoxication and the gravity of the medical situation. Creech also participated in and heard repeated on-scene statements speculating that Pushard "must have taken something else," including statements made to EMS. During the on-scene response, a storeowner offered to show Creech in-store surveillance video from earlier that morning, and Creech declined, stating "Nah."

151.    Creech had a realistic opportunity to intervene. He was present, in close proximity, and remained on scene long enough to take reasonable measures, including directing compliance with EMS requests, ordering adjustment of restraints, stopping further force or intimidation, separating Moreau and Mejia from Pushard, summoning a supervisor, or otherwise intervening to end the ongoing violation while Pushard remained in custody.

152.    Despite this knowledge and opportunity, Creech failed to take reasonable measures to protect Pushard. Creech did not intervene and did not direct that EMS requests be honored, allowing the unconstitutional conduct to continue.

153.    As a direct and proximate result of Creech's failure to intervene, Pushard suffered additional and prolonged physical pain, increased psychological trauma, and continued exposure to a substantial risk of serious medical harm as the unconstitutional conduct continued when it could have been stopped or mitigated.

154.    Creech is not entitled to qualified immunity. At the time of this incident, it was clearly established that an officer who is present, aware that another officer is violating a person's constitutional rights, and who has a realistic opportunity to prevent further harm

must take reasonable measures to intervene. See, e.g., *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995) (denying qualified immunity to an officer who failed to intervene while a fellow officer used excessive force). Accordingly, no reasonable officer in Creech's position could have believed it was lawful to stand by and do nothing while fellow officers continued to obstruct necessary medical care requested by EMS and maintained painful restraints on an obviously incapacitated person in custody.

**COUNT IV**

**42 U.S.C. § 1983 – FOURTH AMENDMENT – UNREASONABLE SEIZURE PURSUANT TO LEGAL PROCESS (MALICIOUS PROSECUTION)**

***Against Defendants Moreau and Mejia, in their Individual Capacities***

155.    Pushard incorporates by reference all preceding paragraphs as if fully set forth herein.

156.    The Fourth Amendment protects individuals from unreasonable seizures, including being seized and subjected to the restraints of the criminal justice system pursuant to legal process that was initiated without probable cause. In the Fifth Circuit, such a claim is grounded exclusively in the Fourth Amendment, as freestanding malicious prosecution claims under § 1983 have been abolished. *See Castellano v. Frago*zo, 352 F.3d 939, 945 (5th Cir. 2003) (en banc). To prevail, a plaintiff must show, inter alia, that the criminal proceeding terminated in their favor, a standard satisfied by the dismissal of the charge. *See Thompson v. Clark*, 596 U.S. 36 (2022). An officer violates this right when he knowingly or recklessly supplies false information, or omits material information, to cause a baseless prosecution. It is clearly established that an

officer is not entitled to qualified immunity for manufacturing probable cause through such material false statements or omissions. *See Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc); *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013).

157.    Defendants Moreau and Mejia caused the commencement of a criminal prosecution against Pushard for the offense of Resisting Arrest, Search, or Transport. They did so by knowingly or recklessly submitting official reports containing materially false statements and material omissions regarding Pushard's alleged resistance. These false statements and omissions were a substantial factor that caused the Galveston County Criminal District Attorney's Office to file a formal Complaint and Information against Pushard, thereby initiating legal process against him.

158.    The Complaint and Information were filed based on, and relied upon, the false and misleading account of resistance supplied by Moreau and Mejia.

159.    The legal process initiated against Pushard lacked probable cause because it was based on fabrications supplied by Moreau and Mejia. Their written reports manufactured a narrative of active resistance that was directly contradicted by objective evidence they knew to exist, including their own body-worn-camera recordings and their on-scene observations.

160.    Moreau and Mejia's falsehoods were material. When their materially false statements are excised and the materially omitted facts are included, the "corrected" account does not establish probable cause to initiate or continue a prosecution for Resisting Arrest, Search, or Transport. Absent these materially false statements and omissions, there was no lawful basis to subject Pushard to prosecution for resisting arrest.

161.    Moreau and Mejia acted with malice and with knowing or reckless disregard for the truth. Their malicious intent is evidenced by their contemporaneous statements and their reports' resistance narrative.

162.    Moreau and Mejia claimed Pushard refused to exit the vehicle.

163.    Any commands to exit or comply were delivered simultaneously with their immediate physical seizure—both deputies reaching in and taking control of his body, leaving no meaningful opportunity to regain awareness or comply. Pushard still complied. His recorded verbalizations were repeated statements of "okay."

164.    Mejia claimed Pushard was "taken to the ground" because he "would not place his hands behind his back."

165.    Moreau claimed Pushard was "placed" on the ground. Pushard was dragged from the truck and slammed face-first onto the pavement, and no command to place his hands behind his back was given until after he was already face-down on the pavement, being pinned and subjected to additional force.

166.    Mejia falsely told paramedics that Pushard "fought" them, and Moreau told them "we had to fight him," supplying a false resistance narrative in real time to third-party medical personnel.

167.    Moreau and Mejia omitted material facts that negated any probable cause for "resisting," including that they seized Pushard at the same moment they issued any commands; that Pushard was in obvious medical crisis and physically incapable of intentional resistance; and that his recorded verbal responses were statements of compliance as he repeatedly said "okay."

168.    These false statements and material omissions were made with malice to create probable cause for a resisting-arrest charge where none existed and to create a post-hoc justification for their unconstitutional use of force.

169.    As a direct result of the Complaint and Information filed based on the deputies' false resistance narrative, Pushard was seized within the meaning of the Fourth Amendment. This seizure included not only his initial booking and detention but also his subjection to the authority of the criminal court system for approximately nine months, which included the requirements to post bond, retain criminal-defense counsel, and appear for court settings until the charge was dismissed.

170.    The criminal case initiated against Pushard terminated in his favor on May 2, 2025, when the State of Texas dismissed the resisting-arrest charge.

171.    The actions of Moreau and Mejia were the direct and proximate cause of the seizure and continuation of the criminal case against Pushard, which resulted in his loss of liberty, significant emotional distress and humiliation, and substantial financial expense, including the cost of retaining a criminal-defense attorney.

172.    Defendants Moreau and Mejia are not entitled to qualified immunity. At the time of their conduct, it was clearly established that the Fourth Amendment prohibits an officer from initiating or causing a prosecution by knowingly or recklessly making material false statements or omitting material facts in an official report to manufacture probable cause. *See, e.g., Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc); *Whitley v. Hanna*, 726 F.3d 631, 649 (5th Cir. 2013)

173.    No reasonable officer could have believed it was lawful to fabricate a narrative of active resistance and supply it to prosecutors to subject a medically incapacitated person to prosecution for a crime he did not commit.

**COUNT V**

**42 U.S.C. § 1983 – *MONELL* LIABILITY**

***Against Defendant Galveston County, Texas***

174.    Pushard incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

175.    This claim is brought against Defendant Galveston County pursuant to 42 U.S.C. § 1983 for ratifying the illegal and unconstitutional acts of Sergeant Mejia, Deputy Moreau, and Deputy Creech. By formally exonerating the deputies despite possessing overwhelming evidence of their misconduct, Galveston County adopted their unconstitutional actions and the false narrative justifying those actions as its own official policy, directly causing injury to Pushard. This ratification claim is asserted based on the Galveston County Sheriff's ratification of the deputies' conduct as the final policymaker, or, in the alternative, on ratification by a delegated final policymaker, the Chief Deputy.

176.    Under 42 U.S.C. § 1983, a municipality like Galveston County may be held liable when its official policy or custom is the "moving force" behind a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A single unconstitutional act can subject a municipality to liability if a final policymaker ratifies a subordinate's unconstitutional conduct. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). This after-the-fact ratification functions as official policy because, in both a

practical and legal sense, there is no difference between prior authorization and subsequent ratification. *See Harris County v. Nagel*, 349 S.W.3d 769, 792 (Tex. App.— Houston [14th Dist.] 2011, pet. denied). The Fifth Circuit limits such liability to "extreme factual situations," which includes "an obvious violation of clearly established law." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009); *see also Harvey v. Roy*, No. 3:25-cv-58, 2025 U.S. Dist. LEXIS 136234, at *9 (S.D. Tex. July 17, 2025).

177.    Galveston County, through its final policymaker, ratified the deputies' conscience-shocking conduct by expressly approving both the deputies' obvious violations of clearly established law and the unconstitutional basis for them.

178.    The actions of Sergeant Mejia, Deputy Moreau, and Deputy Creech on August 8, 2024, constituted obvious violations of clearly established law and an extreme factual situation. This conscience-shocking conduct included, but was not limited to, the following:

a. Excessive Force: During a welfare check, Mejia and Moreau seized Pushard, who was compliant and in an apparent medical crisis, and subjected him to an extreme and unjustifiable level of force, including five Taser deployments, slamming his face onto the pavement, and keeping him in painful and dangerous restraints.

b. Deliberate Indifference to a Serious Medical Need: At the scene, Moreau and Mejia refused paramedics' requests to adjust Pushard's restraints and knowingly maintained them in a manner that impeded care, demonstrating deliberate indifference to his life-threatening medical needs, while Deputy Creech was present and failed to intervene.

c. Malicious Conduct and Abuse at the Hospital: While Pushard was a hospital patient under cardiac evaluation, Deputy Moreau subjected him to acts of humiliation, punishment, and terror that served no legitimate law enforcement purpose, including pressing a Taser against him, threatening him, and forcing him to urinate in front of him.

d. Deliberate Indifference to a Serious Risk of Suicide: During transport from the hospital to the county jail, Deputy Moreau heard Pushard communicate suicidal intent but took no reasonable steps to secure medical or mental-health intervention.

e. Fabrication of Evidence and Malicious Prosecution: Moreau and Mejia wrote and submitted official reports that intentionally misrepresented the incident, creating a false narrative that Pushard was resisting, and supplied this fabricated narrative to prosecutors to initiate and sustain a criminal prosecution against him.

179.    Under Texas law and as consistently recognized by the Fifth Circuit, the Galveston County Sheriff is the final policymaker for Galveston County in all matters of law enforcement. *See Brady v. Fort Bend Cty.*, 145 F.3d 691, 700 (5th Cir. 1998). The Galveston County Sheriff's Office's own official procedures confirm the Sheriff's role as the final authority on disciplinary matters.

180.    The official determination regarding Pushard's complaint was communicated on official Galveston County Sheriff's Office letterhead and signed by the Chief Deputy. Based on these facts, it is reasonable to infer that either (a) the Sheriff, as the final policymaker, reviewed and approved the exoneration decision and allowed it to stand as the final disposition of Pushard's complaint, thereby implicitly ratifying the deputies' conduct, or, in the alternative, (b) the Sheriff delegated final authority over the

disposition of citizen complaints to the Chief Deputy. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

181.    Before ratifying the deputies' conduct, the final policymaker possessed extensive evidence of the events, including body-worn camera recordings from all three deputies that captured the misconduct, photographs of Pushard's injuries, and Moreau and Mejia's own contradictory written reports. The policymaker possessed full knowledge of the material facts of the deputies' unconstitutional conduct before ratifying it.

182.    Despite possessing full knowledge of the unconstitutional conduct from Pushard's complaint and the video evidence, Galveston County's final policymaker for law enforcement did not discipline or repudiate the deputies. Instead, the policymaker took the affirmative step of expressly ratifying their conduct by issuing an official letter stating that, after a "thorough review," the "findings of the allegation were EXONERATED." By officially determining the deputies' conduct was justified, the policymaker adopted their actions and the unconstitutional basis for them as the official policy of Galveston County.

183.    This act of ratification was the "moving force" behind the violation of Pushard's rights because it endorsed the deputies' unlawful actions, perpetuated the harm of the malicious prosecution by foreclosing any accountability, and communicated to all Sheriff's Office personnel that such "extreme factual situations" would be met with official approval. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

184.    The allegation that the Sheriff's Office issued a formal "EXONERATION" after a "thorough review" of evidence that plainly showed the unconstitutional conduct makes it

implausible at the pleading stage to argue this was anything other than a final policy decision endorsing the specific actions taken against Pushard.

185.    As a direct and proximate result of Galveston County's ratification, Pushard has suffered and will continue to suffer significant damages, including but not limited to physical injuries, pain and suffering, mental anguish, reputational harm, and other pecuniary losses.

## VI. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Pushard respectfully requests that, after trial or other final hearing, the Court enter judgment in his favor and against Defendants, and award the following relief:

A. Compensatory damages against all Defendants, jointly and severally where permitted by law, in an amount in excess of One Million Dollars ($1,000,000.00), with the exact amount to be determined by the jury, for physical injuries, pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, disruption of personal life and employment stability, and all other damages proximately caused by Defendants' conduct.

B. Nominal damages as permitted by law.

C. Punitive damages against the individual Defendants, in an amount to be determined by the jury, for conduct shown to be malicious, oppressive, or in reckless indifference to Pushard's federally protected rights, to punish and deter.

D. A declaration that Defendants' conduct described in this Complaint violated Pushard's rights under the United States Constitution and 42 U.S.C. § 1983.

E. Reasonable attorney's fees and expenses under 42 U.S.C. § 1988 and any other

applicable fee-shifting provision.

F. Taxable court costs.

G. Prejudgment and post-judgment interest as allowed by law.

H. Such other and further legal and equitable relief to which Pushard may be justly

entitled.

## VII. JURY DEMAND

Pushard hereby demands a trial by jury on all issues and claims so triable as a matter of

right.

Respectfully submitted,

MINETTE LAW, PLLC

By: /s/ Heather Minette Schutmaat
Heather Minette Schutmaat
Attorney-in-Charge
State Bar No. 24144259
Southern District of Texas Bar No. 3949333
P.O. Box 369
Kemah, Texas 77565
Tel: (832) 225-6748
Fax: (281) 538-1138
Email: heather@minettelaw.com
ATTORNEY FOR PLAINTIFF